**Tames Clyde THORNE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 82A04–8612–CR–388.

Court of Appeals of Indiana, Fourth District.

June 30, 1987.

Rehearing Denied Aug. 5, 1987.

---

Terry A. White, Evansville, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., for appellee.

MILLER, Judge.

Tames Clyde Thorne appeals his conviction by jury for one count of dealing in PCP, a Class B felony, and two counts of dealing in a substance represented to be a controlled substance, Class D felonies. Thorne, a black man, argues he is entitled to a new trial because the State systematically excluded all potential black jurors by striking the only two prospective black jurors and then failed to provide a neutral explanation for those peremptory challenges. Second, Thorne claims the trial court abused its discretion in refusing to stay the jury selection proceedings because two absent jurors were not properly excused. Finally, Thorne asserts the trial court erred in refusing to give jury instructions on the defense of entrapment.

We affirm.

### FACTS

Calvin Ard worked as a confidential informant for Evansville Narcotics Officers Frank Wilkins, James Allison and William Fiscus. On November 30, 1984, Ard contacted Wilkins and said he had set up a buy for methamphetamine. Wilkins searched Ard and equipped him with a body trans-

mitter. Neither Ard nor Wilkins knew who would be selling the drugs. Wilkins drove Ard to an apartment on Carriage Drive where Ard went inside to make the drug buy. Ard came back outside and told Wilkins the dealer who was coming was Clyde Thorne, who had previously worked as a confidential informant for Wilkins. Ard asked Wilkins how he felt about the seller being Clyde and Wilkins replied, "Well, fine," and Ard returned to the apartment. Wilkins observed the defendant, Tames Clyde Thorne, arrive and enter the apartment. Ard purchased a package of PCP, identified as Exhibit 1, for $55.00 from Thorne and then accepted a ride with Thorne. Wilkins followed Thorne's car but lost it and radioed for backup. Officer Fiscus made contact with Ard and when Wilkins arrived, Ard gave him a baggie containing powder. The substance was later tested and identified as phenecycline (PCP), a Schedule II controlled substance, by William Boles, a forensic chemist at the State Police Post in Evansville.

On December 8, 1984 Ard contacted Officer Allison and told him he had set up another buy of PCP from Thorne for later that day. Allison supervised the drug buy and received a plastic bag containing powder from Ard, identified as Exhibit 2. Boles later tested Exhibit 2 and found it contained nothing identified as a controlled substance.

Officer Fiscus supervised Ard's third PCP buy from Thorne on December 14, 1984 at Thorne's residence and received a baggie of powder identified as Exhibit 3. Boles again tested the substance and found it contained nothing identified as a controlled substance.

Thorne was arrested and charged with one count of dealing in PCP, a Class B felony, and two counts of dealing in a substance represented to be a controlled substance, Class D felonies. Immediately before *voir dire*, the court noted that five (5) prospective jurors were not present. Three of these prospective veniremen were excused. The remaining two were absent and not excused. Thorne's counsel moved for a continuance until the missing jurors could be located. The trial court denied the motion for continuance. Thorne pled not guilty and elected to have a jury trial. During *voir dire*, the State peremptorily struck the only two (2) black prospective jurors called to the jury box. Thorne's counsel moved for a mistrial due to the systematic exclusion of black jurors. The State offered no explanation of its peremptory challenges except to note the state also struck two (2) white jurors out of its four peremptory challenges.

Thorne was found guilty by the jury on all three counts. The trial court sentenced Thorne to ten years on Count I, six to be served and four suspended to probation; two years on Count II and two years on Count III, to be served concurrently. Thorne later petitioned for modification of his sentence and the trial court granted his petition, ordering Thorne's six year executed sentence to be served in the Vanderburgh County Work Release Program.

## ISSUES

Thorne appeals, raising three issues for our consideration:

I. Whether Thorne is entitled to a new trial because the State struck the only two potential black jurors and failed to provide any neutral explanation for these peremptory challenges.

II. Whether the trial court abused its discretion by refusing to stay the proceedings of jury selection due to the absence of two jurors who were not properly excused.

III. Whether the trial court erred in refusing to give the defendant's tendered jury instructions on the defense of entrapment.

## DECISION

I. *Systematic Exclusion of Blacks From the Jury*

■ Thorne argues on appeal that he is entitled to a new trial because the State systematically excluded the only two prospective black jurors from the panel by using two of its ten peremptory challenges to excuse these blacks. Thorne argues the

State provided no neutral explanation—a reason or reasons other than racial—for excusing the two and only prospective black jurors from the panel and so Thorne's due process and equal protection rights have been violated. The State responds that the facts of this case do not establish a racially-directed use of peremptory challenges by the prosecution and directs our attention to the numerous omissions in Thorne's appellate brief.[1]

The Supreme Court recently addressed this issue in *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and *Griffith v. Kentucky* (1987) —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649. Batson, a black man, was indicted in Kentucky on charges of second-degree burglary and receipt of stolen goods. The prosecution used peremptory challenges to strike all four prospective black jurors and a jury composed of only white persons was selected. Batson's counsel moved to discharge the jury on grounds that the prosecutor's removal of all black veniremen violated Batson's rights under the Sixth and Fourteenth Amendments to a jury drawn from a cross-section of the community and under the Fourteenth Amendment to equal protection of the law. The trial court denied defense counsel's motion, Batson was convicted, and the Kentucky Supreme Court affirmed Batson's conviction. The Supreme Court held that the equal protection clause forbids a prosecutor from peremptorily challenging jurors solely on the basis of their race or on the assumption that black jurors as a group will be unable to impartially consider the State's case against a black defendant. The Supreme

Court reaffirmed the principles of *Strauder v. West Virginia* (1880), 100 U.S. (10 Otto) 303, 25 L.Ed. 664, that (1) a State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded, and (2) a defendant has no right to a jury composed in whole or in part of persons of his own race. However, the Supreme Court also specifically overruled that portion of *Swain v. Alabama* (1965), 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, concerning the evidentiary burden placed on a defendant who claims that he has been denied equal protection through the State's discriminatory use of peremptory challenges. In *Swain*, it was held that a black defendant could make out a *prima facie* case of purposeful discrimination on proof that the peremptory challenge system as a whole was being perverted. In *Batson*, the Court redefined the defendant's burden to establish a *prima facie* case and held the defendant must show:

(1) he is a member of a cognizable racial group;

(2) the prosecutor has exercised peremptory challenges to remove that group's members from his jury; and

(3) the facts and circumstances of his case raise an inference the exclusion was based on race. *Batson, supra*. Once the defendant has made a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. The State's explanation need not rise to the level of a challenge for cause. The trial court then has the duty to

---

**1.** We note that Thorne has failed to comply with Appellate Rule 8.3(A)(7) which requires the Appellant's Brief contain:

"(7) an argument ...
The argument shall contain the contentions of the appellant with respect to the issues presented, the reasons in support of the contentions along with citations to the authorities, statutes, and parts of the record relief upon, and a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review ..."

Our examination of the record for evidence on the issue of racial discrimination at *voir dire* is

not assisted by Thorne's omissions in the Statement of the Case, Statement of the Facts, or Argument sections of his brief of the names of the purported excluded black jurors, or any citation to the record to show where their *voir dire* occurred. It is, of course, the duty of the Appellant to make argument with citation to the record such that the facts below may be ascertained by the reviewing court. Because of the seriousness of the issue raised, this court will not deem the issue waived on appeal and will deal with it on the merits. We do, however, admonish Thorne's counsel and direct his attention to Appellate Rule 8.3.

determine whether the defendant has established purposeful discrimination.

■ In the instant case, Thorne has not met his initial burden of establishing the third element of a *prima facie* case. The facts and circumstances of this case do not indicate purposeful racial discrimination. The removal of two black jurors by the use of peremptories does not, by itself, raise an inference of racial discrimination. The first juror, Radcliff Pendleton, indicated he "had been upstate", was currently on probation, and doubted his own ability to judge the case.[2] The State likely could have challenged Mr. Pendleton for cause. The second black juror who was peremptorily challenged by the State was identified by Thorne's counsel in the record as "Mary Sibles." Record, p. 214. However, our time-consuming and thorough search of the *voir dire* record reveals no juror with the name "Mary Sibles."[3] While we are generally able to tell from the record which prospective jurors are female, we find no indication in *voir dire* examination of the race of any of the prospective jurors. One female juror is named "Mrs. Civils" but her first name and her race are not revealed. We cannot assume, in the absence of information explaining the difference in names

or additional information that "Mrs. Civils" is indeed named "Mary" and is black, that the "Mary Sibles" referred to is actually "Mrs. Civils".

Thorne has failed to make a *prima facie* showing raising an inference of purposeful discrimination regarding Radcliffe Pendleton because the record reveals Pendleton could permissibly have been excused for cause. *See, Phillips v. State* (1986), Ind., 496 N.E.2d 87 (defendant failed to establish inference of purposeful racial discrimination in the selection of his jury where prosecutor peremptorily challenged three black jurors and the final jury had one black member; first prospective juror indicated she was acquainted with potential State witness; second juror indicated he had a brother and sister previously convicted in the county; third juror indicated she knew police officer). Thorne has failed to make the necessary *prima facie* showing regarding Mary Sibles due to the "total absence of proper record for review". *See, Weekly v. State* (1986), Ind., 496 N.E.2d 29 (defendant failed to make a *prima facie* showing raising an inference or purposeful discrimination in jury selection where defendant presented "total absence of proper record

2. The record reveals the following interchange between Mr. Pendleton, the deputy prosecutor Mr. Lenn, and the trial court judge:

   "MR. LENN: ... Mr. Pendleton, ...
   JUROR: Yes
   MR. LENN: You indicated that you are in a union, is that correct?
   JUROR: That's right.
   MR. LENN: Local 561. What is that union?
   JUROR: Labor Local.
   MR. LENN: Are you presently employed?
   JUROR: That's right.
   MR. LENN: Do you understand the questions I have been asking so far?
   JUROR: Yes, I do.
   MR. LENN: Do you understand that the State has to prove each of the elements of Count I beyond a reasonable doubt?
   JUROR: Yes, I do.
   MR. LENN: If we did that, could you convict the defendant of Count I beyond a reasonable doubt?
   JUROR: Yes, I could. *I've been up state myself.*
   MR. LENN: Pardon?
   JUROR: *To tell you the truth, I would be fair with you, but I don't think you all would chance it. I'm on probation myself and I don't*

   *know how I would be to judge it, because I'm on probation myself* and ...
   MR. LENN: I understand and I appreciate your honesty on that. You feel that you can't be fair because of that?
   BY THE COURT: Let me clear something up. Mr. Pendleton and I know each other. I was the judge in that case. Mr. Pendleton was convicted of Operation of a Motor Vehicle While Intoxicated Resulting in a Death. That's what it was. He is still on probation for that.
   MR. LENN: Thank you, Mr. Pendleton."
   (emphasis added).
   Record, pp. 142–143.

3. Our careful examination of the record shows more than a dozen jurors were excused. The court made the following entry regarding the challenge of two prospective black jurors:

   "MR. WHITE: First of all, Your Honor, I would like the Court to take judicial notice that Radcliff Pendleton and Mary Sibles were negro prospective jurors and that they were the only negro prospective jurors who were in the box of jurors for the trial of this cause.
   BY THE COURT: So noted."
   Record, p. 214.

for review.") As a result, we find Thorne has failed to establish any purposeful discrimination in the selection of his jury.

## II. *Refusal to Stay Proceedings*

Thorne next alleges the trial court failed, after his timely objection, to comply with the requirements of (1) IND.CODE 33–4–5.-5–15,[4] which specifies the conditions under which a person may be excused by the court from jury duty and (2) I.C. 33–4–5.5–16,[5] which establishes the procedure by which the trial court deals with claims that there was substantial noncompliance by the court with the jury selection process. The State responds that these two code sections, and in fact all of Chapter 5.5, apply by its own terms only to the superior courts of counties of 500,000 to 600,000 population, and this includes only Lake County. The State notes this case was tried to the Vanderburgh Circuit Court and thus Chapter 5.5 does not apply.

Chapter 5.5 provides, in subsection 4 entitled "Definitions"

"Sec. 4. As used in this chapter:

(a) 'Court' means the superior court of counties having a population of not less than five hundred thousand (500,-000) nor more than six hundred thousand (600,000) and also includes all other courts in such counties;"

We conclude Chapter 5.5 does not apply to the Vanderburgh Circuit Court. The general law applicable to jury selection for circuit courts is I.C. 33–4–5. A part of that section explicitly provides:

"... This section shall be construed liberally, to the effect that no indictment shall be quashed, and no trial judgment, order, or proceeding shall be reversed or held invalid on the ground that the terms of this section have not been followed, unless it appears that the noncompliance was either in bad faith or was objected to promptly upon discovery and was proba-

---

**4.** I.C. 33–4–5.5–15 provides:

"Excuse from jury service

Sec. 15. (a) No persons shall be automatically excused under this chapter. The Chief Judge or jury commissioner, upon request of a prospective juror, shall determine on the basis of information provided on the juror qualification form, correspondence from the prospective juror, or interview with the prospective juror whether the prospective juror should be excused from jury service. The jury commissioner shall enter this determination in the space provided on the juror qualification form.

(a) A person who is not disqualified for jury service may be excused from jury service only upon a showing of undue hardship, extreme inconvenience, or public necessity, until the time of the next drawing at which time he will be resummoned. Appropriate records shall be maintained by the jury commissioner to facilitate said resummoning.

(c) Requests for excuse, other than those accompanying return of the qualification form, shall be made by the prospective juror in writing to the Presiding Judge no later than three (3) weeks in advance of the date upon which he has been summoned to appear."

**5.** I.C. 33–4–5.5–16 provides:

"Motion to stay proceedings or dismiss indictment for failure to comply with this chapter

Sec. 16. (a) Within seven (7) days after the moving party discovered or by the exercise of diligence could have discovered the grounds therefore, and in any event before the petit

jury is sworn to try the case, a party may move to stay the proceedings, and in a criminal case, to dismiss the indictment (if the case has been brought by indictment) or stay the proceedings or for other appropriate relief on the ground of substantial failure to comply with this chapter in selecting the prospective grand or petit jurors.

(b) Upon motion filed under subsection (a) of this section containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this chapter, the moving party is entitled to present in support of the motion the testimony of the jury commissioner, any relevant records and papers not public or otherwise available used by the jury commissioner and any other relevant evidence. If the court determines that in selecting either a grand jury or a petit jury there has been a substantial failure to comply with this chapter, the court shall stay the proceedings pending the selection of the jury in conformity with this article and may dismiss an indictment (if the instant case was brought by indictment) or grant other appropriate relief.

(c) The procedures prescribed by this section are the exclusive means by which the state, a person accused of an offense, or a party in a civil case may challenge a jury on the ground that the jury was not selected in conformity with this chapter.

(d) The parties to the case may inspect, reproduce, and copy the records or papers of the jury commissioner at all reasonable times during the preparation and pendency of a motion under subsection (a) of this section.

bly harmful to the substantial rights of the objecting party." I.C. 33–4–5–9(e). We conclude defendant must show noncompliance with this chapter and that noncompliance was either in bad faith or, since Thorne did object promptly, was probably harmful to his substantial rights.

■ The trial court has discretionary authority to excuse prospective jurors. *Holt v. State* (1977), 266 Ind. 586, 365 N.E.2d 1209. The record shows five prospective jurors failed to appear; [6] Francis Craig was 65 years old and was excused by the trial court automatically upon her request; Michael Wayne Scott served on a jury panel the preceding quarter and was excused as ineligible to serve; Terry Coleman was hospitalized and excused. Two remaining jurors failed to appear and were not excused by the trial court: the record establishes Eileen Parent was on vacation and Virgil Baker was out of town and did not receive notice to appear for jury duty.

■ It is unfortunately true that some small percentage of most jury panels will not obey their summons. However, the remedy proposed by Thorne, that a continuance be granted until all jurors, including those on vacation and out of town, can be rounded up is impractical. This would also be unfair to those citizens who diligently came to the courthouse to serve on the jury. Of course, practicality and fairness to the courts and the jurors are secondary to the defendant's rights.

Thorne has argued on appeal that he is entitled to examine these two unexcused prospective jurors as to the validity of their excuses. The trial court conceded that Parents and Baker were absent and unexcused. Thorne has not demonstrated how the unexcused absence of two prospective jurors prejudiced him, or specifically which of his rights were sacrificed because two prospective jurors failed to appear for jury duty. Here, we do not find the absence of two prospective jurors was probably harmful to the defendant's substantial rights.

### III. *Jury Instruction on Entrapment*

Thorne contends that his Tendered Instructions Numbers 1, 4, and 5,[7] concerning entrapment, were improperly denied by the trial court. The State responds that the record reveals no evidence to support Thorne's three tendered instructions on entrapment and so the trial court correctly refused to give these instructions to the jury.

■ To determine whether error resulted from refusal of a tendered instruction, the Court must evaluate: whether the tendered instruction correctly states the law, whether there is evidence in the record which supports the tendered instruction, and whether another instruction covered the substance of the tendered instruction. *Jackson v. State,* (1986) Ind., 490 N.E.2d 1115. The trial court may, in its discretion, refuse any tendered instruction which has

---

6. Thorne makes no argument that any of the five absent jurors is black, or that racial discrimination is in any manner at issue here.

7. Defendant's Tendered Instructions Numbered 1, 4, and 5 read as follows:

"DEFENDANT'S INSTRUCTION NO. 1
The defense of entrapment is defined by law as follows:
It is a defense that the prohibited conduct of the person was the product of a law enforcement officer, or his agent, using persuasion or other means likely to cause the person to engage in the conduct; and the person was not predisposed to commit the offense.
Conduct merely affording a person an opportunity to commit the offense does not constitute entrapment.
The State has the burden of disproving this defense beyond a reasonable doubt.

REFUSED
    DEFENDANT'S INSTRUCTION NO. 4
The term 'law enforcement officer' is defined by law as meaning:
(1) A police officer, sheriff, constable, marshall, or prosecuting attorney;
(2) A deputy of any of those persons; or
(3) An investigator for a prosecuting attorney.
REFUSED
    DEFENDANT'S INSTRUCTION NO. 5
A general agent, as used in the definition of entrapment, is a person, who by agreement with another called the principal, acts for the principal and is subject to control by the principal.
REFUSED"
Record, pp. 24–25.

no foundation in the evidence. *Travis v. State* (1986), Ind., 488 N.E.2d 342.

■ Thorne claims that Officer Frank Wilkins (also known as Fat Frank) set up the three alleged drug buys with informant Calvin Ard acting as his agent in order to seek revenge against Thorne because Thorne was supposed to have been working as an informant for Wilkins and had failed to do his job properly. Thorne further claims that he raised the defense of entrapment through cross-examination of Ard. The relevant portions are as follows:

"Q. You have talked to Frank before haven't you, about Tames Thorne?

A. No, not before then.

Q. Not before the 30th?

A. Frank don't mention his name to me.

Q. Do you remember me asking you ... I asked you this question ... it says, 'Wrote it out?' and your answer was 'Uh-huh.'

A. What now?

Q. Let's go back. Question 159. Remember me asking you ... On Page 13, I asked you about writing out a report and I asked you, 'Wrote it out then, right?' and you said 'Uh-huh.' And I asked you why he wanted Clyde so bad and do you remember giving that answer? That was in reference to Fat Frank, wasn't it?

A. Yeh.

Q. And then I asked you, 'Why?' and you said, 'You mean you want an answer to that?' and I said, 'Yeh' and you said, 'He said he got Clyde out and Clyde was supposed to be working for him, but he wasn't doing his job. You asked and I told you.'

A. Yep.

Q. I asked you, 'That's what I want to know' and he said, 'Clyde was supposed to be working for him and he wasn't doing his job.' And your answer was, 'There you go.'

A. Yep.

Q. And then I asked you, 'And that's why he wanted Clyde?' and you said, 'I guess. He wants anybody that sells. I don't know if it is revenge or whatever, you know.'

A. I said it.

Q. That's what you said?

A. I sure did.

Q. Do you think Frank wanted Clyde for some revenge?

A. I don't know."

Record, pp. 421–22.

We do not read this section of Thorne's cross-examination of Calvin Ard as establishing the defense of entrapment. When asked directly if Frank wanted Clyde for revenge, and responded "I don't know". When asked why Frank wanted Clyde, Ard responded "He wants anybody that sells". The thrust of Thorne's argument is that Wilkins set him up because Wilkins wanted revenge. However, the evidence is undisputed that Ard set up the buy, notified Wilkins, and neither Ard nor Wilkins knew the identity of the seller until immediately before Ard made the buy. Under these circumstances, it was not established that Wilkins even knew the identity of the seller, let alone vindictively induced him to make the sale. Merely raising police involvement in the purchase of drugs does not raise the defense of entrapment. As in *Hensley v. State* (1986), Ind., 489 N.E.2d 62, which also involved a drug purchase made by a confidential informant acting for a police officer, the record in this case shows no evidence to support an instruction on the defense of entrapment.

The judgment of the trial court is affirmed.

CONOVER, P.J., and BUCHANAN, J. concur.